# UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# WESTERN DIVISION

| | |
|---|---|
| DANIEL W. COFFMAN, ) | |
| ) | |
| Petitioner, ) | |
| ) | |
| vs. ) | Case No. 11-0767-CV-W-DW-P |
| ) | |
| JERRY RUSSELL, ) | |
| ) | |
| Respondent. ) | |

## OPINION AND ORDER DENYING PETITION FOR HABEAS CORPUS AND DENYING THE ISSUANCE OF A CERTIFICATE OF APPEALABILITY

Petitioner, Daniel W. Coffman, filed this pro se habeas corpus petition pursuant to 28 U.S.C. § 2254 on August 1, 2011, seeking to challenge his 2007 conviction and sentence for sexual assault, which was entered in the Circuit Court of Boone County, Missouri.

The petition raises two grounds for relief: that trial counsel was ineffective and that the evidence at trial was insufficient. Respondent contends that all claims are without merit.

## SUMMARY OF THE FACTS

On direct appeal, the Missouri Court of Appeals summarized the facts as follows:

> S.B grew up in Fulton, Missouri, and had only an eighth grade education, mostly through special education classes. At the age of 19, S.B. moved to Columbia, Missouri, with her boyfriend in search of employment. The two had no place to stay and were living under a pavilion in a local park. At the time of the incident, S.B. and her boyfriend were still living in the park, and her boyfriend had found employment at a fast food restaurant.
>
> On the morning of July 8, 2006, S.B. woke up as her boyfriend was leaving for work, but she went back to sleep after he left. She woke again as [petitioner] approached her. S.B. recognized [petitioner] because she had seen him at a nearby soup kitchen. The two had exchanged cordial greetings prior to that morning, but she did not otherwise know him. S.B. testified that she believed [petitioner] was

drunk when he sat down at a picnic table under the pavilion because he staggered, smelled of alcohol, and held a cup that also smelled of liquor. She could not understand [petitioner] when he spoke to her but responded to his comments by saying "yeah" and "okay." S.B. testified that she did so because that was how she responded to her alcoholic uncle when she interacted with him while he was inebriated.

S.B. was lying on her stomach, and [petitioner] lay [sic] down beside her and began to rub her back. S.B. told [petitioner] to stop and that she had a boyfriend. She was afraid that he wanted to have sex with her. He ignored her and continued to rub her back. n.2

> n.2 S.B. also testified that she could not recall if [petitioner] responded to her. She stated that if he did respond, she could not understand what he was saying.

[Petitioner] then pulled down S.B.'s pants and underwear and climbed on top of her. [Petitioner] used one hand to push down on S.B.'s back and the other to unzip his own pants. He then began having sexual intercourse with her. S.B. told [petitioner], "Don't. Stop. I have a boyfriend." S.B. tried to get up by pushing back against [petitioner], but that only caused painful, deeper penetration. [Petitioner] continued even after S.B. said, "Stop. I don't want to have sex with you." She repeatedly said, "I have a boyfriend."

Attempting to make him stop, S.B. told [petitioner] she thought she heard someone coming, even though she really had not. [Petitioner] immediately stood up and started to look around, and S.B. wrapped herself tightly in her blanket. When [petitioner] did not see anyone coming, he came back and said, "I want to finish." S.B. told [petitioner] "no," and he passed out next to S.B. on her belongings.

A few minutes later, Timothy LaFleur, who worked at Freedom House n.3 across the street, approached the pavilion while on a cigarette break.

> n.3 Freedom House is a housing community for disabled individuals. LaFleur worked there as a caretaker.

LaFleur saw S.B. crying under the pavilion. S.B. then approached LaFleur and asked him what his definition of rape was. LaFleur

-2-

answered and then asked S.B. if she had been raped, to which she replied, "yes." LaFleur did not know how to respond to the situation, so he went back across the street to ask his fiancée, Trina Simmons, what he should do.

LaFleur returned to the pavilion to bring S.B. back to Freedom House and found her attempting to cut her wrists with a razor blade she had pulled out of her purse. S.B. testified that she wanted to kill herself because she had just been raped. He took off his sock and wrapped it around her cut wrist to stop the bleeding. S.B. then said that she would not leave the pavilion without her belongings. Because [petitioner] was still asleep on S.B.'s belongings, LaFleur woke [petitioner] and told him to leave. LaFleur testified that [petitioner] "seemed kind of out of it, foggy." His voice was slurred, "his eyes weren't registering," and he smelled of alcohol. After [petitioner] got up and went over to the picnic table, LaFleur gathered S.B.'s belongings and they both returned to Freedom House.

S.B. was at Freedom House for several hours off and on throughout the day. S.B. wanted to call the police but was afraid of what her boyfriend might do if he found out that she was raped. Simmons drove S.B. to the soup kitchen around 5:00 p.m. that evening. Upon seeing [petitioner] at the soup kitchen, S.B. returned to Freedom House and called her mother. Around 7:15 p.m., Officer Kyle Lucas of the Columbia Police Department was dispatched to a nearby homeless shelter to make contact with S.B. Officer Lucas took S.B.'s brief statement and noted in his report that S.B. was "very noncompliant," in the sense that she was very hesitant in dealing with an officer. Per Officer Lucas's request, S.B. went with her mother to a hospital and spoke with a detective.

When Officer Lucas returned to the station, the police already had [petitioner] in custody. While he was in the holding cell, [petitioner] was angrily yelling and kicking the bars. When Officer Lucas opened the door to the cell to warn [petitioner] about his behavior, [petitioner] yelled, "There's no goo in her. There's no cum in that cunt." Detective Jason Jones interviewed [petitioner] while he was in custody. Before Detective Jones asked any questions, [petitioner] told the detective that he had sex with S.B. but that it was consensual. [Petitioner] claimed that S.B. undressed herself and helped him undress also. He also told the detective that he had not consumed any alcohol; but during a second interview, [petitioner] said he had a small amount of vodka. [Petitioner] reiterated the fact that he had not ejaculated, saying, "There's no goo in her. There's no evidence."

-3-

> When asked whether S.B. would tell the detective the same story, [petitioner] responded by saying that he "didn't give a fuck, that God knows the truth, and that hopefully she would tell the truth."
>
> A jury trial was held on March 1, 2007, and [petitioner] was found guilty of sexual assault. The court sentenced [petitioner] on the jury's verdict to serve seven years of imprisonment.

(Respondent's Exhibit D, pp. 2-5).

Before the state court findings may be set aside, a federal court must conclude that the state court's findings of fact lack even fair support in the record. Marshall v. Lonberger, 459 U.S. 422, 432 (1983). Credibility determinations are left for the state court to decide. Graham v. Solem, 728 F.2d 1533, 1540 (8th Cir. en banc 1984). It is petitioner's burden to establish by clear and convincing evidence that the state court findings are erroneous. 28 U.S.C. § 2254 (e)(1).[1] Because the state court's findings of fact have fair support in the record and because petitioner has failed to establish by clear and convincing evidence that the state court findings are erroneous, the Court defers to and adopts those factual conclusions.

## INEFFECTIVE ASSISTANCE OF COUNSEL

In his first ground for relief, petitioner claims that trial counsel was ineffective for conceding facts regarding petitioner's lack of sobriety and the victim's non-consent and for failing to call Officer Joseph Jackson, Nurse Goldina McKnight, Doctor Stephen Scott, and criminalist Shawn Bailes as witnesses.

In order to succeed on a claim of ineffective assistance of counsel, petitioner must establish

---

[1] "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

-4-

that: (1) his counsel's performance was unreasonable as viewed in the totality of the circumstances; and (2) his defense was prejudiced by counsel's action in that there is a reasonably probability that, but for counsel's unprofessional acts, the result of the proceeding would have been different. Strickland v. Washington, 466 U.S. 668, 694-95 (1984); Schaeffer v. Black, 774 F.2d 865, 867 (8th Cir. 1985). Reasonably effective assistance of counsel may be defined as the skill and diligence that a reasonably competent attorney would exercise under similar circumstances. See, e.g., Strickland v. Washington, 466 U.S. at 687-90. Judicial scrutiny of counsel's performance must be highly deferential, id. at 689, and there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id.

On appeal from the denial of his Mo. Sup. Ct. Rule 29.15 Motion, the Missouri Court of Appeals disposed of petitioner's claims as follows:

> [Petitioner] contends that trial counsel was ineffective for conceding in closing argument that S.B. had not consented to sexual intercourse with [petitioner] and arguing that [petitioner] did not understand that S.B. was not consenting due to his intoxicated condition. [Petitioner] argues that he was prejudiced because he had denied that he was intoxicated and had maintained that the sexual intercourse was consensual.
>
> The motion court found that trial counsel's theory of the case was that [petitioner] was unaware that he did not have S.B.'s consent because [petitioner] was intoxicated and misunderstood S.B. The motion court found that this was reasonable trial strategy and that there was no reasonable probability that the outcome would have been different had counsel not made this argument at closing.
>
> Although [petitioner] told the police that he was not intoxicated, there was overwhelming evidence presented at trial suggesting that his statement was not truthful. S.B. testified that when [petitioner] approached her, he smelled of alcohol, was carrying a cup that smelled like liquor, and that his speech was slurred. S.B. testified that she could not understand what [petitioner] was saying so she responded to him with "yeah" and "okay." After the incident, S.B.

-5-

encountered Timothy LaFleur who was walking through the park on his cigarette break from his employment as a care provider at Freedom House, which was nearby. S.B., who was crying and shaking, asked LaFleur what he believed constituted rape. LaFleur gathered up S.B.'s belongings from underneath [petitioner] so they could leave. LaFleur also observed that [petitioner] was intoxicated.

The jury was instructed that they should find [petitioner] guilty of sexual assault if they found: (1) that he had sexual intercourse with S.B.; (2) that he did so without S.B.'s consent; and (3) that [petitioner] knew that he did not have S.B.'s consent. The jury was also instructed that an intoxicated condition from alcohol will not relieve a person of responsibility for his conduct.

It was undisputed that [petitioner] had sexual intercourse with S.B. There was overwhelming evidence that S.B. did not consent, including S.B.'s testimony that she told [petitioner] to stop, told him people were coming to get him to stop, and her encounter with LaFleur. [Petitioner] did not testify, and no evidence was adduced to support that S.B. consented. Trial counsel's theory at trial was that although voluntary intoxication was not a defense, the jury could take his condition into account in determining whether [petitioner] knew that he did not have S.B.'s consent. In light of the overwhelming evidence of [petitioner's] guilt, this was reasonable trial strategy. The motion court's finding is not clearly erroneous.

(Respondent's Exhibit H, pp. 7-9).

> [Petitioner] contends that his counsel was ineffective for failing to call four specific witnesses to testify at trial.
>
>> When claiming ineffective assistance of trial counsel for failing to call a witness, the "movant must show that the witness could have been located by reasonable investigation, that the witness would [have] testif[ied] if called, and that the testimony would [have] provide[d] a viable defense." The movant must further establish that the outcome of the case could have been different had the witness testified and that counsel's failure to call the witness was not a simple trial strategy. ***As a rule, "[t]he selection of witnesses and evidence are matters of trial strategy," and are considered "virtually unchallengeable in an ineffective assistance claim."***

-6-

> Moreover, it is well-established that trial counsel is given "wide latitude in defending a client in matters regarding trial strategy."

*Tinsley v. State*, 258 S.W.3d 920, 925 (Mo. App. S.D. 2008) (emphasis added) (citations omitted).

### *Police Officer Joseph Jackson*

[Petitioner] contends that counsel was ineffective for failing to call police officer Joseph Jackson as a witness at trial because S.B.'s statements to him contradicted her testimony at trial, and had he testified, S.B.'s credibility would have been impeached. We disagree.

"Trial counsel's failure to impeach a witness does not, on its own, warrant post-conviction relief." *Gray v. State*, 139 S.W.3d 617, 622 (Mo. App. W.D. 2004). "The movant has the burden of establishing that the impeachment would have provided [the movant] with a defense or would have changed the outcome of the trial." *Id.* (citation omitted).

[Petitioner] complains that when S.B. was interviewed by Officer Jackson on the day of the incident, she stated that [petitioner] had intercourse with her until two men approached. At trial, S.B. testified that she told [petitioner] someone was coming to get him to stop, that he stopped but wanted to continue when he determined no one was actually coming, and that within a minute someone actually approached.

The motion court found that trial counsel was not ineffective for not calling Officer Jackson as a witness because "the victim's prior statement is not totally inconsistent with her trial testimony. The victim told Officer Jackson that the assault continued until two men walked up. This is consistent with her trial testimony that [petitioner] continued to try to assault her. . . until two men walked up. Moreover, even assuming there is a slight inconsistency, this alleged inconsistency is not such that there is a reasonable probability that the verdict would have been different."

The alleged inconsistencies between S.B.'s report to Officer Jackson and her trial testimony were minor and immaterial. *Id.* at 623. Trial counsel testified that her trial strategy was to negate the mental element by arguing that [petitioner] believed S.B. was consenting to

-7-

intercourse. Emphasizing minor inconsistencies in S.B.'s testimony at trial would not have aided in [petitioner's] defense, nor would it have changed the outcome of the trial, as the inconsistencies had nothing to do with whether S.B. consented to sexual intercourse. The motion court's findings were not clearly erroneous.

### *Goldina McKnight and Dr. Steven Scott*

[Petitioner] contends that counsel was ineffective for failing to call Goldina McKnight and Dr. Scott to testify that they observed no physical signs of injury when examining S.B. after the alleged assault. According to [petitioner], this testimony would have corroborated his defense that intercourse with S.B. was consensual.

The motion court concluded that trial counsel was not ineffective in failing to call McKnight and Dr. Scott regarding the lack of any bruising or vaginal tearing because Dr. Scott testified that it was not surprising that S.B. had no visible injuries considering the type of assault S.B. described. According to the motion court, the testimony would not have aided [petitioner's] defense and would have allowed the State another opportunity to relay S.B.'s allegations. The motion court found that trial counsel was not unreasonable and that [petitioner] was not prejudiced.

We cannot see how the testimony of either McKnight or Dr. Scott would have resulted in a viable defense or a different outcome at trial. Dr. Scott testified that the lack of physical injuries was consistent with S.B.'s description of the incident. Dr. Scott testified that S.B. had told him there was no struggle and that she did not fight back. Where a potential witness's testimony would not unqualifiedly support a defendant, the failure to call the witness does not constitute ineffective assistance. *Tinsley*, 258 S.W.3d at 926. The motion court's findings are not clearly erroneous.

### *Criminalist Shawn Bailes*

[Petitioner] contends that counsel was ineffective for failing to call criminalist Shawn Bailes to testify that the DNA found from the vaginal swab of S.B. excluded [petitioner], which would have corroborated his defense that the intercourse was consensual.

The motion court found that this evidence would not have been beneficial to [petitioner] as he claimed he had not ejaculated and S.B. testified that she had intercourse with her boyfriend on the date of the

-8-

> incident. The motion court concluded that trial counsel was not
> unreasonable and that [petitioner] was not prejudiced. The motion
> court's findings are not clearly erroneous.

(Respondent's Exhibit H, pp. 4-7).

The resolution of ground 1 by the state court did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2) (as amended April 24, 1996), as defined by the Supreme Court in Williams v. Taylor, 529 U.S. 362, 412 (2000).[2] Applying the Strickland standard of review to the facts as set forth in the record, the Court finds that counsel was not ineffective.

Ground 1 will be denied.

## INSUFFICIENT EVIDENCE

In ground 2, petitioner claims that the state did not present sufficient evidence to prove beyond a reasonable doubt that he knew S.B. did not consent to sexual intercourse.

On direct appeal, the Missouri Court of Appeals disposed of petitioner's claim as follows:

> [Petitioner] argues that there was insufficient evidence that he knew
> S.B. did not consent to sexual activity. He asserts that S.B.
> responding "yeah" and "okay" to [petitioner], while he was talking
> to her and rubbing her back, and pushing back against him during

---

[2] According to the concurrence of Justice O'Connor, joined by four other members of the Court, "under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts. Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413, 120 S.Ct. at 1523.

Case 4:11-cv-00767-DW   Document 18   Filed 04/19/12   Page 9 of 13

intercourse caused him to believe she was consenting. However, the evidence indicates a reasonable juror could find otherwise.

[Petitioner] claims that he could not have possibly known that S.B. did not understand what he was saying, so he perceived the responses of "yeah" and "okay" to be consent. While it is true that he may not have known that S.B. did not understand him, her other remarks during that time period clearly indicated to [petitioner] a lack of consent. In addition to saying "yeah" and "okay" while [petitioner] was rubbing her back, S.B. testified that she told him to stop and that she had a boyfriend, but he continued to rub her back. S.B. also testified that as [petitioner] pulled down the covers and her pants, she again told him to stop and that she had a boyfriend. Again, he continued. After [petitioner] climbed on top of her and began having intercourse, S.B. told him, "Don't. Stop. I have a boyfriend." [Petitioner] could possibly have perceived her attempt to push him off her by raising her back as participation, but it certainly could not outweigh her multiple statements telling him to stop. [Petitioner] still did not stop even after S.B. explicitly said, "Stop. I don't want to have sex with you." He got off of her only after she said that someone was coming.

In this case, there are little, if any, inconsistencies between the physical facts or surrounding circumstances that would cast doubt on S.B.'s testimony. Also, La[F]leur's testimony partially corroborated her story. The only discrepancy is S.B. testified that as [petitioner] was pulling down her pants, she told him to stop, but in her deposition she said that she only told him that she had a boyfriend. This hardly amounts to a gross inconsistency because she made her lack of consent apparent at several instances during the assault. Given that the jury returned a guilty verdict against [petitioner], we accept as true the evidence in a light most favorable to the verdict and acknowledge S.B.'s testimony as the facts of the case. *Reed*, 181 S.W.3d at 569. As such, her testimony would be sufficient to sustain [petitioner's] conviction. *See Paulson*, 220 S.W.3d at 833-34. *See also State v. Sprinkle*, 122 S.W.3d 652, 666 (Mo. App. W.D. 2003).

However, [petitioner] contends, accepting S.B.'s testimony as true, that the jury should have taken into consideration his intoxication as it caused him to misperceive S.B.'s behavior as consent. It has been widely held that evidence of voluntary intoxication cannot be used to negate the mental state of an offense. *State v. Erwin*, 848 S.W.2d 476, 482 (Mo. banc 1993); *Mouse v. State*, 90 S.W.3d 145, 149 (Mo. App. S.D. 2002). This court in *State v. Fanning* stated:

-10-

> Missouri [law] provides that a person is criminally liable if the state proves all the necessary elements of the crime beyond a reasonable doubt despite intoxication. Missouri has defined all of its criminal offenses so as to render voluntary intoxication legally irrelevant.

939 S.W.2d 941, 947 (Mo. App. W.D. 1997).

[Petitioner] asserts that his intoxication did not render him incapable of acting knowingly, but that in his condition he mistakenly believed, based on misperceptions, that S.B. consented to the sexual activity. Evidence of intoxication can relate to a defendant's mental state, "not to show a lack of the necessary mental state, but to attempt to explain conduct that might otherwise be significant regarding his mental state." *State v. Taylor*, 929 S.W.2d 925, 928 (Mo. App. S.D. 1996). *See also* § 562.076.3 n.4

> n.4 "Evidence that a person was in a voluntarily intoxicated or drugged condition may be admissible when otherwise relevant on issues of conduct but in no event shall it be admissible for the purpose of negating a mental state which is an element of the offense."

By arguing that his self-induced intoxication caused him to misperceive S.B.'s actions as consent, [petitioner] is attempting to circumvent Missouri's statutory prohibition against using evidence of voluntary intoxication to negate a necessary mental state of an offense. Allowing such an argument would "unjustly vindicate [his] unlawful conduct" and violate well-established Missouri law. *Fanning*, 939 S.W.2d at 945. For this reason, evidence of [petitioner's] voluntary intoxication is irrelevant when considering the effect of his misperceptions and determining the criminal liability of his actions.

[Petitioner] also attempts to argue that because the record shows that S.B. is an "extremely quiet talker," it clearly negates any inference that [petitioner] heard any of S.B.'s statements indicating a lack of consent. He reasons that because the court and jurors had a difficult time hearing her testimony, it shows he would not have heard her during the alleged assault. However, it would be very difficult to accept that, in such a close proximity, [petitioner] heard S.B. say "yeah" and "okay," that someone was coming, and "no," when he

-11-

>     asked to finish, n.5 but did not hear any of her multiple statements
>     telling him to stop.
>
>     > n.5 [Petitioner] contends that the first time he learned
>     > that S.B. did not consent to the sexual activity was
>     > after S.B. said "no" when he asked to finish after he
>     > got up to see if anyone was coming.
>
>     Viewing the evidence in the light most favorable to the verdict, a reasonable juror could very well infer from the evidence that [petitioner] did in fact hear her.
>
>     Additionally, it would be reasonable to infer that [petitioner] knew that he had done sometime wrong, based on his statements at the police station. Direct evidence showing a required mental state is rarely available, and the defendant's intent may be inferred from other evidence. *Id.* The defendant's "'mental state can be determined from his testimony, evidence of his conduct before the act, the act itself, and his subsequent conduct.'" *Id.* (emphasis added) (quoting *State v. Runyon*, 619 S.W.2d 955, 957 (Mo. App. E.D. 1981)). While in the holding cell and during the interview with Detective Jones, [petitioner] made statements, such as, "There's no goo in her. There's no cum in that cunt," and "There's no evidence." Taken in context, a reasonable juror could conclude that [petitioner] knew that he had sexual intercourse without the victim's consent.

(Respondent's Exhibit D, pp. 6-9).

The resolution of ground 2 by the state court did not result in "a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or in "a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1) and (2) (as amended April 24, 1996), as defined by the Supreme Court in <u>Williams v. Taylor</u>, 529 U.S. 362, 412 (2000).

Ground 2 will be denied.

## **CERTIFICATE OF APPEALABILITY**

Under 28 U.S.C. § 2253(c), the Court may issue a certificate of appealability only "where a petitioner has made a substantial showing of the denial of a constitutional right." To satisfy this standard, a petitioner must show that a "reasonable jurist" would find the district court ruling on the constitutional claim(s) "debatable or wrong." Tennard v. Dretke, 542 U.S. 274, 276 (2004). Because petitioner has not met this standard, a certificate of appealability will be denied. See 28 U.S.C. § 2254, Rule 11(a).

### **ORDER**

Accordingly, it is **ORDERED** that:

(1) the above-captioned petition for a writ of habeas corpus is denied;

(2) this case is dismissed with prejudice; and

(3) the issuance of a certificate of appealability is denied.

      /s/ Dean Whipple
DEAN WHIPPLE
UNITED STATES DISTRICT JUDGE

Kansas City, Missouri,

Dated: April 19, 2012.